# Exhibit 1

# THERAPY SERVICES AGREEMENT

THIS THERAPY SERVICES AGREEMENT (the "Agreement") is entered into and effective as of the 1st day of October, 2016 (the "Effective Date") by and between Kindred Rehab Services, Inc., a Delaware corporation, d/b/a RehabCare ("RehabCare") and Mount Carmel Health Care, LLC d/b/a Burlington Medical and Rehab Center ("Facility").

## RECITALS:

WHEREAS, Facility operates a licensed skilled nursing facility, which may be Medicare and/or Medicaid certified, that furnishes nursing and related services to its patients who are in need of such services.

WHEREAS, RehabCare is a rehab therapy provider that employs and/or otherwise engages qualified professionals (individually referred to herein as "Therapist" and, collectively, "Therapy Personnel") who furnish physical and occupational therapy and speech-language pathology services ("Therapy Services") to inpatients of health care facilities, and who may also furnish therapy services to outpatients of such facilities (individually, referred herein as "patient" and, collectively, referred to herein as "patients"), who are in need of such services.

WHEREAS, Facility desires to engage RehabCare to provide Therapy Services to its patients and RehabCare desires to provide these Therapy Services on the terms set forth herein.

WHEREAS, Facility and RehabCare have negotiated the terms of this agreement pursuant to the terms of separate agreements between RehabCare and Infinity Procurement Services, L.L.C. ("Infinity"), and between Facility and Infinity.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in consideration of the mutual covenants set forth herein, the parties agree as follows:

1. Obligations of RehabCare.

    a. Services. RehabCare shall provide Therapy Services to patients of Facility available seven (7) days per week in accordance with the patients' applicable plans of care and the timeframes established by federal and/or state laws and regulations. Subject to this obligation, RehabCare shall be responsible for assigning individual Therapy Personnel to provide services at the Facility and for scheduling the times at which Therapy Services will be provided. Therapy Personnel shall commence providing Therapy Services to a patient upon RehabCare's receipt of: (a) the written order of an attending physician given in accordance with accepted professional practices and (b) specific authorization from the Facility to provide Therapy Services to the patient. Further, RehabCare will provide Therapy Services in accordance with the written policies of the Facility to the extent Facility provides a copy of or access to such policies to RehabCare.

    b. Qualified Personnel. RehabCare shall provide Facility with sufficient personnel to deliver the Therapy Services under this Agreement. RehabCare shall employ or engage qualified personnel to provide all such Therapy Services to patients of Facility, as the case may be. RehabCare will maintain and, upon request, provide Facility with the credentials and qualifications of all Therapy Personnel furnishing Therapy Services, as well as copies of current licenses and/or registrations and renewals. All Therapy Personnel providing Therapy Services at the Facility shall maintain in good standing all federal, state and local licenses, certifications, registrations, and permits which are required to provide Therapy Services according to the laws and regulations of the jurisdiction in which such Therapy Services are provided.

    c. Record Maintenance. RehabCare will prepare treatment records with respect to Therapy Services performed by RehabCare under this Agreement in accordance with the requirements of any Medicare Administrative Contractor ("MAC") / Fiscal Intermediary ("FI") and any federal or state agency, and/or any other party to whom billing for services are rendered. RehabCare will make such records available for prompt incorporation by Facility into its clinical records. The original records will at all times be and remain the property of Facility.

d. Plan of Treatment. RehabCare will provide Therapy Services in a reasonably satisfactory manner, in compliance with professional standards, and in accordance with a plan of treatment established from time to time by the physician responsible for each patient's care or other qualified health care professional as permitted by law.

e. Care Planning Conferences. RehabCare's Therapy Personnel, upon reasonable notice and request by Facility, will participate in care planning conferences required to coordinate the care of an individual therapy patient.

2. Obligations of Facility.

a. Professional and Administrative Responsibilities. Facility shall maintain professional and administrative control and supervision over Therapy Services rendered. Specifically, without limitation, Facility will be responsible for obtaining all required written orders for the provision of Therapy Services to patients from each patient's attending physician in accordance with accepted professional practices. Facility will also be responsible, in consultation with the physician who certifies a patient's plan of care and Therapy Personnel, for deciding when to initiate, alter, and terminate the provision of Therapy Services to a patient.

b. Facility Personnel.
   (i) Facility agrees to provide sufficient support personnel to have patients ready to receive Therapy Services at the agreed upon times and to transport patients to the rehab premises. Facility agrees to provide timely notice to RehabCare of admissions and discharges of therapy patients. Facility further agrees to provide timely notice to RehabCare of individual patient's inability to receive Therapy Services due to illness, discharge or any other reason that would affect the scheduled therapy for any patient. Facility acknowledges that its obligations under this Section greatly impact the efficiency of Therapy Personnel in their delivery of Therapy Services.
   (ii) If, in Facility's reasonable judgment, any Therapy Personnel has failed to adequately perform material job responsibilities or has failed to act in accordance with applicable standards of professional and ethical conduct, then Facility shall notify RehabCare in writing. Within five (5) business days of receiving such notice, RehabCare will meet (either in person or by telephone) with Facility to review the reasons for Facility's dissatisfaction and to attempt to cure the situation. Facility may suggest that RehabCare take an appropriate personnel action with respect to any Therapy Personnel that have been the subject of a notification under this paragraph, but RehabCare retains the exclusive right to determine any and all appropriate personnel actions regarding its Therapy Personnel.

c. Designation of Representative. Facility shall designate an individual to whom RehabCare shall report and upon whose authority RehabCare will be entitled to rely for any needed directions and approvals.

d. Patient Information. Facility will be responsible for conducting an assessment utilizing the Minimum Data Set ("MDS") classification system for each patient who is covered by the Medicare Prospective Payment System and ensuring that the acuity level for each patient has been properly documented to permit the patient to be assigned to the appropriate Medicare Resource Utilization Group ("RUG"). Facility shall provide payor verification and methodology (Resource Utilization Group ("RUG") methodology (per diem), HCPCS, or per minute) in writing to RehabCare for each patient prior to the initiation of Therapy Services. Facility shall promptly notify RehabCare of any changes in writing of a therapy patient's eligibility for third-party payor coverage or payor source. Facility shall provide RehabCare with any other information, assistance, documentation and cooperation, which may be required or appropriate for RehabCare to fulfill its duties and responsibilities under this Agreement and any applicable federal and state laws.

e. Billing and Submission of Cost Reports. Facility shall be solely responsible for, and incur the costs associated with, the preparation and submission of all cost reports, bills, and other claims for reimbursement to patients, government health care programs and other third-party payors. Notwithstanding anything to the contrary contained herein, RehabCare may, upon written authorization of the Facility, direct bill any third party provider for Therapy Services if RehabCare is able to bill. In such cases, any revenues collected become the exclusive property of RehabCare.

f. Space and Equipment. Facility shall provide all therapy equipment and supplies required by RehabCare to furnish Therapy Services pursuant to this Agreement, unless otherwise agreed to by the parties. If any equipment or supplies are provided by RehabCare, such equipment and supplies shall remain at all times the exclusive property of and for exclusive use by RehabCare. Facility shall: (i) set aside designated areas adequate for RehabCare's provision

of the Therapy Services (including, but not limited to, adequate storage space for equipment and supplies); (ii) maintain such designated areas in accordance with applicable federal, state and local laws, rules and regulations; and (iii) pay for all costs for all changes or additional analog, broadband, and residual cabling related to any space location change of RehabCare by Facility after the initial set up. Without limiting the foregoing, Facility shall supply the necessary utilities and support services (such as laundry and housekeeping) reasonably necessary to allow RehabCare to provide the Therapy Services at Facility. RehabCare will use such space, utilities and support services solely for the purpose of fulfilling its duties under this Agreement.

3. Exclusivity. Subject to the last sentence of this Section 3, RehabCare shall be the exclusive agent of Facility to furnish Therapy Services at Facility. Except to the extent necessary to comply with the last sentence of this Section 3 during the Term of this Agreement, Facility will not enter into any agreement with any person or entity, or retain any person or entity, to provide any Therapy Services substantially similar to those provided by RehabCare under this Agreement. However, nothing in this Agreement shall be construed to limit the right of any patient to select an ancillary rehabilitation services provider that can provide rehabilitation services from an offsite Facility location.

4. Compensation.

a. Fees. Facility shall pay RehabCare, within the time period set forth in 4(b), the Fees set forth in *Exhibit A* attached hereto for the Therapy Services rendered, as adjusted for Annual Fee Adjustments set forth in *Exhibit A* (individually, referred to herein as the "Fee" and, collectively, the "Fees"). During the Term of this Agreement (as defined below), the parties may amend the Fees from time to time by executing a written amendment hereto.

b. Invoices. RehabCare shall submit an invoice to Facility within five (5) business days following the close of the monthly billing period. Subject to the other provisions of this Agreement, Facility shall remit payment in full as shown on each invoice within forty-five (45) days after the date of the invoice. Facility shall notify RehabCare of any charge(s) in dispute no later than ten (10) days of its receipt of the invoice or upon identification of the charge(s) in dispute, whichever is earlier. Consideration of any disputes with respect to which RehabCare receives notice after such date shall be at the sole and absolute discretion of RehabCare. Facility's payment of an invoice within the remittance period set forth above shall not be deemed to waive its right to dispute any charge(s) contained in such invoice. The parties agree to work diligently and in good faith to promptly resolve any such disputed charges, but the mere existence of a dispute shall not afford Facility any right of offset.

c. Late Payments. If Facility fails to make any payment when due, late payments shall bear interest from the date an invoice is due until paid at the rate of one and one-half percent (1½ %) per month pro-rated for partial months. Payments with respect to which interest has accrued shall be applied to interest first. Inaction on the part of RehabCare to request or demand payment of any interest shall not constitute a waiver of its right to receive such interest. All funds collected by Facility from all sources which represent funds collected for Therapy Services provided by RehabCare for which RehabCare has not been paid will be deemed held in trust by Facility for the benefit of RehabCare in the amounts owed to RehabCare. If RehabCare is required to collect any amounts past due through use of an attorney, then Facility shall be responsible for payment of all of RehabCare's legal fees and other costs of collection.

d. Denials. For purposes of this Agreement, a "Denial" shall mean any denial, disallowance or reduction of Medicare reimbursement based upon RehabCare's failure to perform its obligations under this Agreement, and which results from a clinical finding of a lack of medical necessity for Therapy Services rendered by RehabCare.

e. Notice Requirements.

i. For any Additional Documentation Requests ("ADR") by a Medicare Contractor, Facility agrees to notify RehabCare in writing within ten (10) calendar days of the date of such ADR by sending a copy of the ADR to the Program Director of the Facility and to the RehabCare Appeals Department.
ii. For any Denial, Facility shall provide the required written notice and copies of all related documents within ten (10) calendar days to the Program Director of the Facility, to the RehabCare Appeals Department, and to the address in Section 7.i of this Agreement. "Related documents" include, but are not limited to: (1) any demand letter for

repayment; and (2) any printout of the online claim summary including a valid paid date, itemized covered/non-covered charges and the narrative remarks page associated with the Denial.

iii. During the pendency of any Appeal handled by RehabCare, Facility shall provide written notice of any communication or data relevant to the appeal within five (5) calendar days to the Program Director of the Facility and to the RehabCare Appeals Department.

iv. If Facility fails to provide notice to RehabCare as required in this paragraph, Facility shall remain responsible for compensating RehabCare for the Therapy Services rendered, whether or not Facility receives payment for such Therapy Services.

f. Appeals.

i. RehabCare may, at its option, appeal any Denial forwarded by Facility in accordance with this Agreement. Facility shall authorize the Medicare Contractor or agency involved to discuss the status of the applicable claim under appeal with RehabCare, and shall, if RehabCare consents in writing, appoint RehabCare to act as its agent for purposes of conducting such an appeal. The parties agree to cooperate in preparing such an appeal.

ii. At the time RehabCare ceases to be Facility's rehabilitation provider, RehabCare will no longer commence any appeal for which notice has not already been provided by Facility to RehabCare. Existing appeals will continue to be managed by RehabCare according to the terms of this Agreement unless otherwise agreed by the parties.

g. Facility's Remedy in Connection with a Denial.

i. This provision sets forth Facility's exclusive remedy in connection with any Denial.

ii. As to any Denial, RehabCare shall be liable to Facility only up to the amount paid to RehabCare by Facility for Therapy Services that were the subject of the Denial, and shall not be liable for other losses resulting from the Denial.

iii. RehabCare's liability for a Denial shall be satisfied by a credit from RehabCare to Facility against RehabCare's invoices to Facility. RehabCare shall provide direct payment rather than credit if and only if RehabCare is no longer Facility's rehabilitation provider and there is no outstanding invoice to which a credit may be applied. Facility is not eligible for an advance credit or direct payment pending the outcome of an appeal.

iv. In order to be eligible for a credit or direct payment, Facility must have timely notified RehabCare of the Denial in accordance with this Agreement; and either

    a)   the Denial is appealed by RehabCare as provided above and upheld in a final administrative decision; or

    b)   RehabCare does not pursue an appeal, or ends the appellate process without transferring the management of the appeal to another party.

v. Notwithstanding the foregoing, RehabCare shall have no legal liability, pursuant to this Agreement or otherwise, for any Denial if Facility has failed to do any of the following:

    a)   comply with any provisions of this Agreement;

    b)   submit the claim for reimbursement to the MAC/FI or agency no later than four months after the Therapy Services were rendered;

    c)   correctly complete and submit the MDS assessment, as applicable, including the timeliness of the assessment;

    d)   secure proper physician's orders, certifications, or recertifications for the Therapy Services;

    e)   correctly determine and comply with applicable third-party payor coverage requirements or communicate to RehabCare a rehabilitation patient's eligibility for third party-payor coverage or change in coverage status; or

    f)   otherwise pursue or assist with pursuing an appeal in a competent manner.

h. Fair Market Value. Both Facility and RehabCare acknowledge and agree that the amounts payable by Facility to RehabCare hereunder have been determined by the parties through good faith and arms-length bargaining to be the fair market value of the services rendered by RehabCare under the terms of this Agreement. No amount paid or to be paid hereunder is intended to be, nor shall it be construed to be, an offer, inducement or payment, whether directly or indirectly, overtly or covertly, for the referral of patients by RehabCare to Facility or for recommending or arranging the purchase, lease or order of any item or service.

i.   Facility's Remedy in Connection with any Other Medicare or Other Third Party Payor Reimbursement Adjustment.   In the event of any voluntary overpayment refund, disallowance, recoupment, reduction, or other payment adjustment of Medicare or other third-party payor reimbursement for Therapy Services that is not a Denial for dates of service when RehabCare was Facility's rehabilitation provider which (i) results from RehabCare's failure to perform its obligations under this Agreement; and (ii) did not result from the failure of Facility, its agents, or employees to: (A) comply with any provisions of this Agreement; (B) submit the claim for reimbursement to the MAC/FI or agency no later than four (4) months after the Therapy Services were rendered; (C) correctly and accurately complete and submit the MDS assessment, as applicable, including the timeliness of the assessment; (D) secure proper and timely physician's orders, certifications, or recertifications for the Therapy Services; or (E) correctly determine and comply with applicable third-party payor coverage requirements and communicate to RehabCare a rehabilitation patient's eligibility for third party-payor coverage or change in coverage status, RehabCare shall refund or credit Facility only up to the  amount paid to RehabCare by Facility for Therapy Services that were the subject of the reimbursement adjustment within 90 days of receipt of such reimbursement adjustment's findings and reasonable supporting documentation.

5.   Term and Termination.

a.   Initial Term; Renewal Term. This Agreement shall have an initial term commencing on the date first above written (the "Effective Date") and concluding at the end of one (1) year following **October 1, 2016**, the date on which RehabCare will commence responsibility for providing Therapy Services at the Facility (the "Operational Date"). The period of time from the Effective Date to that date which is one (1) year after the Operational Date is herein called the "Initial Term". At the end of the Initial Term, the term of this Agreement shall automatically renew for successive one (1) year periods ("Renewal Term"), unless earlier terminated as provided in this Agreement. The Initial Term and any Renewal Term will be collectively referred to herein as "Term".

b.   Termination.
(i)   If either party commits a breach of this Agreement, the non-breaching party may terminate this Agreement by delivery of written notice of termination to the breaching party. The Agreement will terminate if the breach is not cured within thirty (30) days of the breaching party's receipt of written notice of the breach from the non-breaching party, specifying the nature of the breach. Notwithstanding the above, Facility shall be considered to have materially breached this Agreement and failed to cure the breach if it fails to pay any invoice for Therapy Services within forty-five (45) days of the date of the invoice. Facility shall not be entitled to notice of breach and a cure period before RehabCare shall be entitled to terminate this Agreement for non-payment.
(ii)   Each party shall have the right to terminate this Agreement immediately by delivery of written notice of termination to the other party, without the right to cure if any material license, permit, registration, certification, or authorization required for the other party to conduct its business as related to this Agreement is not obtained or is at any time suspended, revoked or otherwise not maintained in good standing.
(iii)   Either party may terminate this Agreement immediately upon written notice to the other stating the effective date of termination upon occurrence of a Bankruptcy Event. As used in this Agreement a "Bankruptcy Event" shall be deemed to occur with respect to a party if it shall apply for or consent to the appointment of a receiver, trustee, or liquidator for all or a substantial part of its assets, file a voluntary petition in bankruptcy, make a general assignment for the benefit of creditors, file a petition or an answer seeking reorganization or arrangement with creditors or take advantage of any insolvency law, or if an order, judgment or decree shall be entered by any court of competent jurisdiction, on the application of a creditor, adjudicating it as bankrupt or insolvent or approving a petition seeking reorganization or appointing a receiver, trustee, or liquidator of all or a substantial part of its assets, and such order, judgment or decree shall continue unstayed and in effect for any period of ninety (90) consecutive days.
(iv)   Either party may terminate this Agreement, with or without cause, at the end of the Initial Term upon thirty (30) days prior written notice. Should Facility elect to terminate this Agreement, pursuant to this Section, any and all amounts due for Therapy Services rendered prior to the date of termination, must be received in full and in accordance with the terms of this Agreement. If such payment for Therapy Services is not current with the terms of this Agreement, then Facility must pay any and all past due amounts before Facility may terminate this Agreement.

c.   Termination by Facility Upon Sale, Lease Expiration, etc.

(i)    If Facility shall have complied with Section 5(c)(ii) below, then Facility will have the right to terminate this Agreement effective upon the occurrence of any of the following events (each a "Facility Operator Change") by giving RehabCare not less than ninety (90) days prior written notice of the expected occurrence of such event and such termination:

A.    the sale of all or substantially all of the assets of Facility to a person which is not related by ownership or control to the current operator of Facility;

B.    the sale or other transfer of a majority of the stock or other equity interests of the Facility to a person which is not a Facility person related by ownership or control to the current operator of Facility;

C.    any merger, consolidation or other transaction which results in a majority of the stock or other equity interests of Facility (or of the person resulting from such merger, consolidation or other transaction) being owned by one or more persons other than the current operator of Facility persons or its affiliates; or

D.    the termination or expiration or assignment of any management agreement, lease or similar agreement which results in Facility no longer being operated by the current operator of Facility person or its affiliate.

(ii)    In addition to providing ninety (90) days prior notice of any Facility Operator Change, as required in Section 5(c)(i) above, Facility shall, at least fifteen (15) days prior to such Facility Operator Change, furnish a copy of this Agreement to the successor operator or new Facility owner(s) and put RehabCare into contact with the successor operator or new Facility owner(s). In the case of a Facility Operator Change described in clauses A or D above, Facility shall use good faith reasonable efforts to have the successor operator of the Facility assume this Agreement, if first so requested by RehabCare. Any such assumption of this Agreement shall be pursuant to an assignment and assumption agreement executed by the Chief Financial Officer of RehabCare, a duly authorized representative of Facility, and the successor operator pursuant to which Facility assigns its rights under this Agreement to such successor operator, and such successor operator assumes Facility's obligations hereunder, in each case with respect to periods from and after the effective date of the Facility Operator Change. Upon RehabCare's receipt of a copy of such agreement and the occurrence of such Facility Operator Change, Facility shall disburse to RehabCare all amounts owed for Therapy Services rendered through the date of closing and Facility shall be relieved of any further obligation hereunder with respect to periods from and after the effective date of such Facility Operator Change, and all references herein to "Facility" shall mean and refer to such successor operator. With respect to a Facility Operator Change described in clauses B or C above, upon the request of RehabCare, Facility shall use good faith reasonable efforts to cause the new owner(s) of Facility to agree to Facility's continued performance hereof as part of such transaction. In the event that Facility fails to satisfy any of its obligations in this Section 5, Facility shall have no right to terminate this Agreement on account of such Facility Operator Change.

(iii)    For purposes of this Agreement, "Person" means any natural person, corporation, partnership, limited liability company, trust, government or governmental entity, and any other type of legal entity whatsoever; "Control" of a Person means the power, whether exercised directly or through one or more intermediaries, to direct or cause the direction of the management and policies of such Person, whether through the ability to appoint a majority of the governing board of such Person, through exercise of general partnership rights, or otherwise.

d.    Termination by RehabCare. Facility shall be in default of this Agreement should Facility: (i) fail to timely pay its Fees as required by Section 4 of this Agreement; or (ii) comply with the requirements of Section 5(c)(ii). If Facility breaches any terms set forth in Section 4 or Section 5(c)(ii), RehabCare may, at its sole discretion, terminate this Agreement and demand immediate payment of all Fees and interest owed to RehabCare pursuant to this Agreement. If RehabCare elects to provide notice, doing so in no way waives any of its rights as set forth in this Agreement.

e.    Obligations Upon Expiration or Termination. Neither the termination of this Agreement under this Section 5 nor the expiration of this Agreement shall be deemed to affect any rights or obligations of the parties arising under this Agreement prior to the effectiveness of such termination or expiration, including without limitation any outstanding liabilities for Therapy Services rendered or any liabilities for breach. The provisions of Sections 4, 5, 6, and 7 shall survive any expiration or termination hereof. Upon expiration or termination of this Agreement, Facility shall make available for pick-up by RehabCare any equipment, supplies or other items (if any), which are the property of RehabCare and located at Facility.

6.    Non-Solicitation. During the Term of this Agreement and for a one (1) year period after the date of expiration or termination of this Agreement, Facility and any affiliates (e.g., parent, subsidiary, sister corporation or any successor-in-interest) shall not directly or indirectly solicit or employ (as an employee, independent contractor or otherwise) any

employee or contract Therapist of RehabCare without the prior written consent of RehabCare. "Indirectly employ" shall include, but not be limited to, Facility or its affiliates contracting with, or receiving Therapy Services from another provider who employs or contracts with any person who was employed or contracted with RehabCare within the previous year. This provision shall only apply to those RehabCare employees or contract Therapists of RehabCare who performed Therapy Services for, or had material contact with, Facility and any affiliates, during the Term of this Agreement. The parties agree that damages may not adequately compensate RehabCare for a breach of this provision and that RehabCare shall be entitled to injunctive relief and specific performance in addition to all other remedies.

7.  Additional Provisions.

a.  Insurance. Each party shall maintain, for itself and on behalf of each of its employees providing services hereunder, general and professional liability insurance with a limit of not less than $1,000,000 per occurrence and $3,000,000 in the aggregate; provided, however, that Facility shall not be required to maintain such general and professional liability insurance at such level to the extent that RehabCare consents in writing to reduced coverage, which consent shall not be unreasonably withheld, subject to written evidence from Facility of suitable alternative risk financing. Each party shall ensure the other party is provided and consistently possesses a current certificate of insurance evidencing the agreed upon coverage. Each party shall provide the other with at least thirty (30) days prior written notice of the cancellation or change in their respective insurance coverage.

b.  Indemnification. Each party (in such capacity, an "Indemnifying Party") agrees to defend and indemnify the other party, its affiliates and their respective officers, directors, members, shareholders, employees and agents (each an "Indemnified Party") against, and hold the same harmless from, all liability, losses, damages, obligations, judgments, claims, causes of action and expenses (including court costs and attorneys' fees) (collectively, "Claims") resulting from or arising out of, directly or indirectly, any breach by the Indemnifying Party of any of its covenants, representations or warranties contained in this Agreement. Notwithstanding the foregoing, an Indemnifying Party shall not be obligated to defend, indemnify and hold harmless an Indemnified Party from and against a Claim to the extent that such Claim results from or arises out of the criminal or malicious act of any Indemnified Party. Each Indemnified Party shall notify the Indemnifying Party promptly of any Claim asserted by a third-party for which such Indemnified Party is or may be entitled to indemnification hereunder, and shall provide an opportunity for the Indemnifying Party to consult on the terms of the resolution of any such claim. The failure to promptly give such notice by the Indemnified Party, and/or the failure to provide for such consultation, shall limit and/or negate the Indemnifying Party's obligation to indemnify and hold harmless the Indemnified Party to the extent the Indemnifying Party is actually prejudiced by such failure. The Indemnifying Party shall have the right to assume the defense of any such third-party Claim at its own expense, and by counsel reasonably satisfactory to the Indemnified Party, by so notifying the Indemnified Party within ten (10) days after the Indemnified Party notifies it of such third-party Claim. If the Indemnifying Party so assumes the defense of a third-party Claim, it may settle such Claim with the consent of the Indemnified Party, which such consent shall not be unreasonably withheld, conditioned or delayed.

c.  Independent Contractor. The parties agree that each is at all times acting and performing as an independent contractor under this Agreement. Nothing in this Agreement shall be construed as creating a partnership, joint venture or employment arrangement between the parties. In particular, Facility's personnel, including Facility's nursing personnel, will not be deemed employees or agents of RehabCare. Facility will not be responsible for the compensation (including wages, benefits, workers' compensation insurance, and liability insurance) for Therapy personnel. RehabCare will not be responsible for the compensation (including wages, benefits, workers' compensation insurance, and liability insurance) for Facility personnel.

d.  Nondiscrimination. Neither party shall discriminate on the basis of race, color, sex, age, religion, national origin, sexual orientation, pregnancy, marital status, veteran status or disability in providing services under this Agreement or in the selection of employees or independent contractors.

e.  Proprietary Information.
(i)  For purposes of this Agreement, the term "Proprietary Information" will include all types of proprietary data, trade secrets, and confidential information of Facility or RehabCare (or such party's affiliates), whether oral or written, which is not legitimately in the public domain, including, but not limited to the following: (i) all proprietary

documents, including but not limited to any proposal, financial data, memoranda, manuals, handbooks, forms and audio or visual recordings which contain written information relating to the services provided hereunder; (ii) all computer software developed or provided by each party hereto (including all documentation relating thereto); (iii) all proprietary methods, techniques and procedures utilized in providing treatment services to patients; (iv) all marketing strategies and related demographics; (v) all trademarks, trade names and service marks of Facility and RehabCare; and (vi) all other information, documentation, data, know-how, devices, designs, and technology, whether obtained before or after the execution of this Agreement, relating to such other party's business, trade secrets, customers and finances, without regard to medium of storage or method of transmission of such information. Notwithstanding the foregoing, "Proprietary Information" of the other party shall not include information with respect to such other party which the first party can prove was in its possession prior to the initiation of the negotiation of this Agreement, or is information generally available within the healthcare, rehabilitation, or long term care industries, or is information rightfully obtained by it through third party sources.

(ii)     Facility and RehabCare agree to maintain the confidentiality of the Proprietary Information disclosed to it by the other party; absent express prior written consent, neither Facility nor RehabCare will disclose or reveal the other's Proprietary Information to any third party, except to the extent such disclosure is required by law, pursuant to subpoena or other legal process. If any person seeks to compel Facility or RehabCare to disclose the other's Proprietary Information, then Facility or RehabCare, as appropriate, will promptly notify the party owning such Proprietary Information so that such party has the opportunity to seek an appropriate protective order.

(iii)     Facility and RehabCare agree not to duplicate or make any copies of the Proprietary Information of the other except as necessary to carry out its responsibilities under this Agreement. Upon termination of this Agreement by either Facility or RehabCare for any reason whatsoever, Facility will promptly return to RehabCare and RehabCare will promptly return to Facility all material constituting or containing Proprietary Information of the other. Neither Facility nor RehabCare will thereafter use, appropriate, reproduce, or disclose such information to any third party, except to the extent such disclosure is required by law, pursuant to subpoena or other legal process.

(iv)     Facility acknowledges that "RehabCare" is a registered service mark belonging exclusively either to RehabCare or one of its affiliates and that, during the Term of this Agreement only, Facility is licensed to utilize this service mark in connection with the provision of Therapy Services. Facility's use of this service mark will not give Facility any right or title therein, and any common law service mark rights acquired as a consequence of Facility's use thereof are hereby assigned exclusively to RehabCare and its affiliates. At the termination of this Agreement, Facility will immediately terminate the use of this service mark and any other service mark owned by RehabCare or a RehabCare affiliate unless a separate written service mark license agreement, specifically authorizing continued use of such service mark, is entered into by the parties hereto at that time. Facility will not cause any documents to be printed bearing a service mark of RehabCare or a RehabCare affiliate without an accompanying mark indicating that such service mark is the registered service mark of RehabCare or its affiliate, as applicable.

(v)     Both Facility and RehabCare each recognize and agree that violation or breach of this provision may result in grievous and irreparable harm to the other party, which harm may be difficult to quantify, and that neither party will have an adequate remedy at law for breach of this Article VI. Therefore, Facility and RehabCare both agree to waive any defense that the other party has an adequate remedy at law and agree that the other party may enforce its rights in equity by injunctive or other equitable relief, in addition to whatever other remedies may exist at law. Both parties also waive any requirement for the securing or posting of any bond in connection with the obtaining of any such injunctive or other equitable relief.

f.     Force Majeure. No party to this Agreement shall be liable for failure to perform any duty or obligation that said party may have under the Agreement where such failure has been occasioned by any act of God, fire, strike, inevitable accident, war, or any cause outside the reasonable control of the party who had the duty to perform.

g.     Access to Books and Records. Until the expiration of four (4) years after the furnishing of goods or services hereunder, the parties shall make available to the Secretary of the Department of Health and Human Services ("Secretary") and the Comptroller General, or their duly authorized representatives, this Agreement, any subcontracts, and such other books, documents, and records that are necessary to certify the nature and extent of costs for goods or services pursuant to 42 U.S.C. § 1395(x)(v)(1)(I) and 42 C.F.R. § 420.300 et seq., and any other applicable law or regulation. If either party carries out any of the duties of this Agreement through a subcontract worth $10,000.00 or more over a twelve (12) month period with a subcontractor or with a related organization, the subcontractor shall also

Case 2:17-cv-00910-NJ   Filed 11/17/17   Page 9 of 21   Document 28-1

contain an access clause to permit access by the Secretary, Comptroller General, and their authorized representatives to the related organization's books and records subject to the same contingencies noted above.

h.  Change in Law. In the event that any federal or state legislative or regulatory authority adopts any statute or regulation which: (a) renders this Agreement illegal or prohibited; (b) establishes a material adverse change in the method or amount of reimbursement or payment for Therapy Services rendered under this Agreement; or (c) imposes requirements which require a material adverse change in the manner of either party's operations under this Agreement, then the party materially and adversely affected by any such change in statute or regulations may, within ninety (90) days of the effective date of such change, request in writing that the parties enter into good faith negotiations for the purpose of establishing such amendments or modifications as may be appropriate in order to accommodate the change in statute or regulations while preserving the original intent of this Agreement to the greatest extent possible. If, within sixty (60) days after the date of such written request, the parties are unable to reach an agreement through good faith negotiations as to how this Agreement will continue, then the party adversely affected may terminate this Agreement upon thirty (30) days prior written notice to the other party.

i.  Notices; Consents. All notices, consents or other communications that either party is required or may desire to give to the other under this Agreement shall be in writing and shall be given by facsimile, personal delivery, or by deposit, postage prepaid, in the United States mail, certified or registered mail, return receipt requested, addressed to the parties at their respective address set forth below:

| If to RehabCare: | RehabCare |
| --- | --- |
| | 680 South Fourth Street |
| | Louisville, KY 40202 |
| | President, RehabCare |
| | Fax: (502) 596-4797 |
| | cc:   Appeals/Denials Dept., St. Louis |
| | Fax: (888) 305-1459 |
| | cc:   General Counsel, RehabCare |
| | Fax: (502) 596-4785 |
| If to Facility: | Burlington Medical and Rehab Center |
| | 677 E. State Street |
| | Burlington, WI 53105 |
| | Attn: Administrator |
| | Fax: (262) 763-2202 |
| With copy to: | Midwest Geriatric Management, LLC |
| | 6 City Place Drive, Ste. 430 |
| | St. Louis, MO 63141 |

Any notice sent in compliance with this provision shall be deemed to have been given upon the earlier of receipt or three (3) days after mail deposit, except that notice of change of address shall not be deemed effective until actual receipt by the intended recipient.

j.  Licensure and Certification. Each party shall operate at all times in compliance with federal, state and local laws, rules and regulations, the standards of The Joint Commission (if applicable), and all currently accepted methods and practices related to the provision of Therapy Services contemplated hereunder. Facility hereby certifies that it is licensed by the state or commonwealth in which Facility is located and that it has all necessary approvals and certifications required by the appropriate state and federal agencies in order to qualify for and participate in the Medicaid and Medicare programs and for RehabCare to furnish Therapy Services to Facility's patients as contemplated by this Agreement.

k.  Governing Law; Severability. This Agreement shall be construed under, and governed in accordance with, the laws of the state in which Facility is located. The parties further agree that any legal action related to, in any way, the

terms, conditions or rights set forth in this Agreement, shall be venued in the state in which the Facility is located. The invalidity or unenforceability of any provision herein shall not affect the validity or enforceability of any other provision. In the event that any provision of this Agreement or the application of any provision to the parties with respect to their obligations hereunder shall be held by a tribunal of competent jurisdiction to be unlawful or unenforceable, the remaining provisions of this Agreement shall continue in full force and effect and the parties shall endeavor in good faith to replace the unlawful or unenforceable provision with one that is lawful and enforceable and gives the fullest effect to the intent of the parties as expressed herein.

l. Headings; Construction. The headings of this Agreement are inserted for convenience only and are not to be considered in the interpretation of this Agreement. The parties acknowledge that each party, and, at each party's discretion, its counsel, have reviewed and revised this Agreement and, consequently, any rule of construction that would hold that any ambiguities if found to be contained herein are to be resolved against the drafting party is not applicable in the interpretation of this Agreement.

m. No Waiver; Amendment. No waiver of any breach of any provision of this Agreement shall be construed to be a waiver of any other breach of this Agreement, whether of a similar or dissimilar nature. This Agreement cannot be modified or amended, nor may any party's rights hereunder be waived, except by a written amendment or waiver signed by the Chief Financial Officer of RehabCare or designee specifically authorized by the Chief Financial Officer of RehabCare and a duly authorized representative of Facility.

n. Entire Agreement; No Markings. This Agreement and any appendices constitute the complete and entire agreement of the parties hereto and supersedes, as of the Effective Date, all prior or contemporaneous representations or agreements or undertakings and understandings of the parties, whether expressed or implied, in connection with the subject matter hereof. The parties represent and warrant that no promise or inducement has been offered by either party in exchange for a party's consent to the terms of this Agreement, except as set forth herein. Any handwritten mark ups or changes to this Agreement shall be ineffective and unenforceable.

o. Attorneys' Fees; Available Remedies. In the event of the commencement of a suit to enforce any of the terms or conditions of this Agreement, the prevailing party in such litigation shall be entitled to reasonable attorneys' fees and costs from the losing party. In addition to any remedies provided herein, the parties shall have all available remedies afforded under applicable laws.

p. Authority; Due Execution. Each party represents and warrants to the other that this Agreement has been duly authorized, executed and delivered by it and constitutes a valid and binding obligation, enforceable in accordance with its terms.

q. Assignability; No Third-Party Beneficiaries. Neither party may assign its rights or obligations hereunder without the prior written approval of the other; provided, however, that such an assignment may be made to an entity which is related by virtue of a common parent corporation or which is directly or indirectly wholly owned or controlled by the same entity as the assigning party. There are no third-party beneficiaries to this Agreement.

r. Deficit Reduction Act. RehabCare's parent company, Kindred Healthcare, Inc., and its affiliates are committed to complying with the laws and regulations that govern its operations as a healthcare provider, employer and business. The federal False Claims Act, 31 U.S.C. §§ 3729-3733, and similar state laws assist the federal and state governments in combating fraud and abuse and recovering losses resulting from fraud in government programs, purchases and/or contracts. These laws prohibit the knowing and/or intentional use of false or fraudulent claims, records or statements for the purpose of obtaining payment from the government. These laws apply to Medicare and Medicaid reimbursement and prohibit, among other things, billing for services not rendered; billing for undocumented services; falsifying cost reports; billing for medically unnecessary services; assigning improper codes to secure reimbursement or higher reimbursement; and participating in kickbacks. A violation of these laws may result in civil, criminal and/or administrative penalties, including monetary penalties, imprisonment, exclusion from participation in Medicare and Medicaid and loss of licensure status. Federal law and some state laws allow private citizens to file a lawsuit on behalf of the government, and to share in a percentage of any monetary recovery or settlement. These laws and Kindred policy prohibit retaliating or discriminating against employees because of their initiation of, or participation in a lawful false claims investigation, report, claim or proceeding. These laws also provide for certain monetary awards and

equitable relief to the prevailing plaintiff, including compensation for lost wages and reinstatement to a former position. Summaries of the federal False Claims Act, related state laws and applicable whistleblower provisions are posted on Kindred's external website and on Kindred's intranet website (Knect). Suspected false claims violations should be reported to Kindred Management, Kindred's Compliance Department (800) 545-0749, or to the appropriate federal or state agency.

s. **Compliance with Laws and Regulations.** In connection with the performance of this Agreement, the parties shall comply in all material respects with all applicable statutes, regulations, rules, orders, ordinances and other laws of any governmental entity to which this Agreement and the parties' obligations under this Agreement are subject, including, without limitation: 42 U.S.C. §§ 1320a-7, 1320a-7a and 1320a-7b(b), commonly referred to as the "Medicare and Medicaid Exclusion Statute," the "Civil Money Penalties Statute," and the "Federal Anti-Kickback Statute," respectively; 31 U.S.C. § 3729 et seq., the statute commonly referred to as the "Federal False Claims Act"; 42 U.S.C. § 1395nn, the statute commonly referred to as the "Stark Law"; the Health Insurance Portability and Accountability Act of 1996 and its implementing regulations ("HIPAA"), which include the Standards for the Privacy of Individually Identifiable Health Information (the "Privacy Rule"), the Standards for Electronic Transactions, and the Security Rule (45 C.F.R. Parts 160–64), and the Privacy provisions (Subtitle D) of the Health Information Technology for Economic and Clinical Health Act and its implementing regulations (the "HITECH Act") (collectively, and as amended from time to time, the "HIPAA Rules"); the Federal Occupational Safety and Health Act; the Americans with Disabilities Act; and any laws or regulations relating to the environment or to hazardous materials or substances as defined in such laws or regulations, as any or all of the above may be amended or supplemented from time to time (and with any and all laws enacted to replace or succeed such laws). Facility agrees to adhere to RehabCare's compliance policies, procedures, protocols, and the Covered Contractor provisions of a Corporate Integrity Agreement ("CIA"), as applicable.

If any provision of this Agreement or activity required hereunder is found to violate any applicable federal, state or local law or regulation, order or policy issued under any such laws, the parties agree to renegotiate this Agreement to eliminate such violation(s).

RehabCare and Facility shall enter into a Business Associate Agreement in the form attached hereto and incorporated herein as *Exhibit B*.

t. **Compliance Program.** Facility acknowledges by execution of this Agreement that it is aware of Kindred's Code of Conduct and Compliance Program as Kindred is the parent company for RehabCare. A complete Code of Conduct is available at Kindred's website, which is located at http://www.kindredhealthcare.com under Investors and Corporate Governance. RehabCare will provide Facility with a copy of the Summary Code of Conduct upon Facility's request. Facility agrees to comply with the Code of Conduct and shall comply with all federal, state and local regulations pertaining to the provision of Therapy Services pursuant to this Agreement. RehabCare commits that RehabCare and its employees will provide Therapy Services to Facility pursuant to this Agreement in accordance with applicable federal and state laws and ethical business and accepted standards of practice that are consistent with RehabCare's Code of Conduct.

RehabCare represents and warrants to Facility that RehabCare, its officers, directors and employees/contractors (i) are not currently excluded, debarred, or otherwise ineligible to participate in the federal health care programs as defined in 42 USC § 1320a-7b(f) (the "Federal Healthcare Programs") or any state healthcare programs; (ii) have not been convicted of a criminal offense related to the provision of healthcare items or services but have not yet been excluded, debarred, or otherwise declared ineligible to participate in the Federal Healthcare Programs or any state healthcare programs; and (iii) are not, to the best of its knowledge, under investigation or otherwise aware of any circumstances which may result in RehabCare being excluded from participation in the Federal Healthcare Programs or any state healthcare programs. This shall be an ongoing representation and warranty during the term of this Agreement and RehabCare shall immediately notify Facility of any change in the status of the representations and warranty set forth in this section. Any breach of this section shall give Facility the right to terminate this Agreement immediately for cause.

u. **Program Representations.** The parties hereby represent, warrant and covenant that, as of the Effective Date and for the Term hereof, with respect to any federal or state health care program (collectively, "Program") as defined by applicable state and federal laws, neither party or any individual with a direct or indirect ownership or central interest of five (5%) percent or more in either party has ever been barred, suspended or excluded from either Program. The parties agree to immediately notify the other party if this representation at anytime in the future is no longer correct.

v. **Electronic Storage of Agreement.** The parties hereto agree and stipulate that the original of this Agreement, including the signature page, may be scanned and stored in a computer database or similar device, and that any printout or other output readable by sight, the reproduction of which is shown to accurately reproduce the original of this document, may be used for any purpose just as if it were the original, including proof of the content of the original writing.

w. **Counterparts; Electronically Transmitted Signatures.** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which, when taken together, shall constitute one and the same agreement. Any electronically transmitted signature or photocopy of a signature to this Agreement shall be deemed an original signature to this Agreement and shall have the same force and effect as an original signature. For purposes of this Section, an "electronically transmitted signature" means a manually-signed original signature that is sent in the form of a facsimile or sent via the internet as a "pdf" (portable document format) or other replicating image attached to an e-mail message.

x. **EEOC Executive Order 11246.** Unless this Agreement is exempted by rules, regulations, or orders of the Secretary of the United States Department of Labor, the parties agree to comply with the Equal Employment Opportunity provisions of Executive Order 11246, § 503 of the Rehabilitation Act of 1973, and the Vietnam Era Veterans' Readjustment Assistance Act.

**The parties shall abide by the requirements of 41 CFR 60-1.4(a), 60-300.5(a) and 60-741.5(a). These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and prohibit discrimination against all individuals based on their race, color, religion, sex, sexual orientation, gender identity or national origin. Moreover, these regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, protected veteran status or disability.**

The parties also agree, where applicable, to comply with the regulations set forth under 29 CFR part 471, Appendix A to Subpart A regarding NLRA compliance.

IN WITNESS WHEREOF, the duly authorized representatives of the parties hereto have executed this Agreement as of the Effective Date.

MOUNT CARMEL HEALTH CARE, LLC D/B/A
BURLINGTON MEDICAL AND REHAB
CENTER

By: _____

Title: _____
("Facility")

KINDRED REHAB SERVICES, INC.
D/B/A REHABCARE

By: _____
Mattingly (May 2, 2016)

Title: Chief Financial Officer
("RehabCare")

Case 2:17-cv-00910-NJ   Filed 11/17/17   Page 13 of 21   Document 28-1





REDACTED

Case 2:17-cv-00910-NJ   Filed 11/17/17   Page 15 of 21   Document 28-1

# THERAPY SERVICES AGREEMENT
## EXHIBIT B
### BUSINESS ASSOCIATE AGREEMENT

THIS BUSINESS ASSOCIATE AGREEMENT ("Agreement") is entered into this 1st day of October, 2016, by and between Mount Carmel Health Care, LLC d/b/a Burlington Medical and Rehab Center ("Covered Entity") and Kindred Rehab Services, Inc., d/b/a RehabCare ("Business Associate").

## RECITALS:

A. Covered Entity, including facilities/agencies owned and operated by Covered Entity, is designated as a "Covered Entity," as defined by the federal Health Insurance Portability and Accountability Act of 1996 and its promulgating regulations ("HIPAA"), and as amended by the regulations promulgated pursuant to the Health Information Technology for Economic and Clinical Health Act ("HITECH").

B. Business Associate has an underlying business relationship ("Underlying Contract") with Covered Entity, in which Business Associate performs functions or activities, or provides certain services, on behalf of Covered Entity.

C. In the course of providing such services, Business Associate may have access to, receive from, maintain, transmit, create, and/or receive on behalf of Covered Entity, Protected Health Information ("PHI").

D. Covered Entity and Business Associate intend to protect the privacy and provide for the security of PHI disclosed to Business Associate pursuant to this Agreement and in order to comply with HIPAA and its implementing regulations including the Privacy Rule (defined below), the Security Rule (defined below) and the Breach Notification Rule (defined below).

NOW, THEREFORE, in consideration of these recitals and the mutual promises contained in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Covered Entity and Business Associate, intending to be legally bound, agree as follows:

## AGREEMENT:

### I. DEFINITIONS

A. "Breach" shall have the meaning given to such term at 45 C.F.R. § 164.402.

B. "Breach Notification Rule" shall mean the rule related to breach notification for Unsecured Protected Health Information at 45 C.F.R. Parts 160 and 164.

C. "Electronic protected health information" or ("EPHI") shall have the same meaning given to such term under the Security Rule, including, but not limited to, 45 C.F.R. § 160.103 limited to the information created or received by Business Associate from or on behalf of Covered Entity.

D. "HIPAA Rules" shall mean the Privacy, Security, Breach Notification and Enforcement Rules.

E. "Privacy Rule" shall mean the Standards for Privacy of Individually Identifiable Health Information, codified at 45 C.F.R. Parts 160 and Part 164, Subparts A and E.

F. "Protected Health Information" or "PHI" shall have the meaning given to such phrase under the Privacy and Security Rules at 45 C.F.R. § 160.103, limited to the information created or received by Business Associate from or on behalf of the Covered Entity.

G. "Security Rule" shall mean the Security Standards for the Protection of Electronic Protected Health Information, codified at 45 C.F.R. § 164 Subparts A and C.

H. "Unsecured PHI" shall have the meaning given to such phrase under the Breach    Notification Rule at 45 C.F.R. § 164.402.

I. Other terms used, but not otherwise defined, in this Agreement shall have the same meaning as those terms in the Privacy, Security or Breach Notification Rules and the Underlying Contract. Where there is a conflict between meanings in either this Agreement together with the Privacy, Security or Breach Notification Rules and the Underlying Contract, then the meanings in this Agreement together with the Privacy, Security or Breach Notification Rules shall govern.

## II. OBLIGATIONS OF THE PARTIES WITH RESPECT TO PHI.

A. Obligations of Business Associate. Business Associate shall:

1. Not use or disclose PHI other than as permitted or required by the Underlying Contract or as required by law;

2. Not use or disclose PHI in a manner that would violate the Privacy Rule if done by the Covered Entity, unless expressly permitted to do so pursuant to the Privacy Rule and this Agreement, provided that if Business Associate carries out one or more of Covered Entity's obligations under the Privacy Rule pursuant to the Underlying Contract, Business Associate shall fully comply with the Privacy Rule requirements that would apply to Covered Entity in the performing those obligations;

3. Use appropriate safeguards, and comply with the Security Rule at Subpart C of 45 CFR Part 164 with respect to EPHI, to prevent use or disclosure of PHI other than as provided for by the Agreement;

4. Report to Covered Entity immediately, and in no case later than five (5) calendar days of Business Associate's discovery, any use or disclosure of PHI not provided for by the Agreement of which it becomes aware, any Breaches of Unsecured PHI as required at 45 CFR 164.410, any security incident of which it becomes aware, or any breach as such may be defined under relevant state data breach laws ("State Law Breach"). Any notice of a Breach or State Law Breach referenced in this Section IV will include the results of the risk assessment of whether there is a low probability that the PHI has been compromised based on the required factors set forth in 45 CFR 164.402 if the Breach is discovered on or after September 23, 2013, and to the extent possible, the identification of each individual whose Unsecured PHI has been, or is reasonably believed by Business Associate to have been accessed, acquired, used, or disclosed during such Breach. Notwithstanding anything set forth in this Agreement or the Underlying Contract, Business Associate shall be responsible for the cost of the risk assessment and any breach mitigation expenses and shall indemnify, defend and hold Covered Entity and its officers, directors, affiliates, employees, agents, successors and assigns harmless, from and against any and all losses, claims, actions, demands, liabilities, damages, costs and expenses (including costs, expenses incurred in notifying individuals, the media or government agencies in connection therewith) and any judgments, settlements, court costs and reasonable attorneys' fees actually incurred (collectively, "Breach Claims") arising from or related to: (i) the use or disclosure of PHI in violation of the terms of this Agreement or applicable law, and (ii) whether in oral, paper or electronic media, any HIPAA Breach of unsecured PHI and/or State Law Breach. If Business Associate assumes the defense of a Breach Claim, Covered Entity shall have the right, at its expense, to participate in the defense of such Breach Claim. Business Associate shall not take any final action with respect to any Breach Claim without the prior written consent of Covered Entity. To the extent permitted by law, Business Associate shall be fully liable to Covered Entity for any acts, failures or omissions of its agents and subcontractors in furnishing the services as if they were the Business Associate's own acts, failures or omissions;

5. Make available PHI in a designated record set to Covered Entity in the form and format as necessary to satisfy Covered Entity's obligations under 45 CFR 164.524 within five (5) business days of receiving a request from Covered Entity;

6. Provide access, at the request of Covered Entity, and in no case later than five (5) business days after such request, to PHI in a Designated Record Set, to Covered Entity or, as directed by Covered Entity, to an Individual or third party designated by the Individual, in the form or format requested if it is readily producible in such form or format in order for the Covered Entity to meet the requirements under the Privacy Rule;

7. Make any PHI contained in a Designated Record Set available to Covered Entity (or an Individual as directed by Covered Entity) within five (5) business days of a request for purposes of amendment per 45 C.F.R. §164.526. If an Individual requests an amendment of PHI directly from Business Associate or its Subcontractors, Business Associate shall forward the request to Covered Entity within two business days;

8. Maintain and make available the information required to provide an accounting of disclosures to Covered Entity as necessary to satisfy Covered Entity's obligations under 45 CFR 164.528. If an accounting of disclosures is requested by an individual directly to Business Associate, the Business Associate will forward the request to Covered Entity within two (2) business days;

9. To the extent the Business Associate is to carry out one or more of Covered Entity's obligation(s) under Subpart E of 45 CFR Part 164, comply with the requirements of Subpart E that apply to Covered Entity in the performance of such obligation(s) and to the extent any such obligations involve disclosures of PHI to health plans, comply with the requirements of 45 CFR 164.522 regarding requested restrictions on health plan disclosures;

10. Make its internal practices, books and records, including policies and procedures, relating to the use and disclosure of PHI available to the Secretary of HHS and to Covered Entity for purposes of determining Covered Entity's compliance with the HIPAA Rules;

11. Use appropriate safeguards to prevent use or disclosure of PHI other than as provided for by this Agreement. Implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of EPHI as required by 45 C.F.R. Part 164 Subpart C ("Security Rule"). With respect to EPHI, Business Associate shall comply with all applicable state laws governing information security breaches;

12. Ensure that any agents and Subcontractors that create, receive, maintain or transmit PHI on behalf of Business Associate agree to the same restrictions and conditions that apply through this Agreement to Business Associate with respect to such information. Business Associate shall ensure that any agent or Subcontractor to whom Business Associate provides EPHI agrees to implement reasonable and appropriate safeguards to protect EPHI.

13. To the extent permitted by law, cooperate with Covered Entity to ensure that legal process conforms with the applicable requirements of the HIPAA Rules, or, if necessary in Covered Entity's opinion, obtain a qualified protective order to limit or prevent the disclosure of PHI in the event of the receipt of a subpoena, court or administrative order or other discovery request.

B. Permitted Uses or Disclosures by Business Associate. Business Associate may use or disclose PHI only:

1. As necessary to perform the services set forth in the Underlying Contract, provided that Business Associate must be specifically authorized in writing by an authorized representative of Covered Entity to use PHI to de-identify the information in accordance with 45 CFR 164.514(a)-(c);

Case 2:17-cv-00910-NJ   Filed 11/17/17   Page 18 of 21   Document 28-1

2. As required by law;

3. If uses and disclosures and requests for PHI are consistent with Covered Entity's minimum necessary policies and procedures;

4. In a manner that would not violate Subpart E of 45 CFR Part 164 if done by Covered Entity, except that Business Associate may use PHI to carry out the legal responsibilities of the Business Associate only if Business Associate obtains reasonable assurances from the person to whom the information is disclosed that the information will remain confidential and used or further disclosed only as required by law or for the purposes for which it was disclosed to the person, and the person agrees to notify Business Associate of any instances of which it is aware in which the confidentiality of the information has been breached; and

5. To provide data aggregation services relating to the health care operations of Covered Entity only if authorized to do so in the Underlying Contract.

C. Covered Entity Privacy Practices and Restrictions.

1. Covered Entity shall notify Business Associate of any limitation(s) in the notice of privacy practices of Covered Entity under 45 CFR 164.520, to the extent that such limitation may affect Business Associate's use or disclosure of PHI.

2. Covered Entity shall notify Business Associate of any changes in, or revocation of, the permission by an individual to use or disclose his or her PHI, to the extent that such changes may affect Business Associate's use or disclosure of PHI.

3. Covered Entity shall notify Business Associate of any restriction on the use or disclosure of PHI that Covered Entity has agreed to or is required to abide by under 45 CFR 164.522, to the extent that such restriction may affect Business Associate's use or disclosure of PHI.

## III. TERM AND TERMINATION.

A. Term. This Agreement shall be effective as of the date set forth above and shall continue until Business Associate ceases to perform the services defined in the Underlying Contract.

B. Termination for Cause. Covered Entity may immediately terminate this Agreement in the event that Business Associate materially breaches any provision of this Agreement or the Underlying Contract.

In its sole discretion, Covered Entity may permit Business Associate the opportunity to cure or to take substantial steps to cure such material breach to Covered Entity's satisfaction within thirty (30) days after receipt of written notice from Covered Entity.

C. Obligations of Business Associate upon Termination. Upon the expiration or termination of this Agreement for any reason, Business Associate, with respect to PHI received from Covered Entity, shall:

1. Retain only that PHI which is necessary for Business Associate to continue its proper management and administration or to carry out its legal responsibilities;

2. Return to Covered Entity or destroy all PHI in any form, including such information in possession of Business Associate's Subcontractors, and retain no copies, if it is feasible to do so;

3. If return or destruction is not feasible, extend all protections, limitations and restrictions contained in this Agreement to Business Associate's use and/or disclosure of any retained PHI, and to limit further

uses and/or disclosures to only those purposes that make the return or destruction of the PHI infeasible;

4. Not use or disclose PHI retained by Business Associate other than for the purposes for which such PHI was retained and subject to the same conditions set forth above in section B under "Permitted Uses and Disclosures by Business Associate" which applied prior to termination.

5. Return to Covered Entity the PHI retained by Business Associate when it is no longer needed by Business Associate for its proper management and administration or to carry out its legal responsibilities.

This provision and the breach reporting provisions in Section III (A)(4) shall survive the termination or expiration of this Agreement and/or any Underlying Contract.

## IV. MISCELLANEOUS.

A. Amendment. Amendments to this Agreement may be necessary to comply with modifications to the HIPAA Rules. Covered Entity and Business Associate agree to use good-faith efforts to develop and execute any amendments to this Agreement as may be required for compliance with the HIPAA Rules. This Agreement may be amended or modified only in writing signed by Covered Entity and Business Associate.

B. Severability. In the event any provision of this Agreement is held to be unenforceable for any reason, the unenforceability thereof shall not affect the remainder of the Agreement, which shall remain in full force and effect and enforceable in accordance with its terms.

C. Independent Contractor. For purpose of its obligations under this Agreement, Business Associate is an independent contractor of Covered Entity and shall not be considered an agent of Covered Entity.

D. Limited Liability Exclusion. To the extent that Business Associate has limited its liability under the terms of the Underlying Contract, whether with a maximum recovery for direct damages or a disclaimer against any consequential, indirect or punitive damages, or other such limitations, all limitations shall exclude any damages to Covered Entity arising from Business Associate's breach of its obligations relating to the use and disclosure of PHI.

E. Equitable Remedies. Business Associate stipulates that its unauthorized use or disclosure of PHI would cause irreparable harm to Covered Entity, and in such event, Covered Entity shall be entitled to institute proceedings in any court of competent jurisdiction to obtain damages and injunctive relief.

F. Ownership of PHI. Under no circumstances shall Business Associate be deemed in any request to be the owner of any PHI used or disclosed by or to Business Associate by Covered Entity.

G. No Third Party Beneficiaries. Nothing expressed or implied in this Agreement is intended to confer, nor shall anything herein actually confer, upon any person other than Covered Entity, Business Associate and, to the extent specified above, their respective parent entities, subsidiaries, affiliates, facilities, insurers, employees, directors, officers, subcontractors, agents or other members of their respective workforces, successors or assigns, any rights, remedies, obligations or liabilities whatsoever.

H. Waiver. No provision of this Agreement or any breach thereof shall be deemed waived unless such waiver is in writing and signed by the party claimed to have waived such provision or breach. No waiver of a breach shall constitute a waiver of or excuse any different or subsequent breach.

I. Assignment. Neither Party may assign (whether by operating or by law or otherwise) any of its rights or delegate or subcontract any of its obligations under this Agreement without the prior written consent of the other party. Notwithstanding the foregoing, Covered Entity shall have the right to assign its rights and

obligations hereunder to any entity that is an affiliate or successor of Covered Entity, without the prior approval of Business Associate.

J. Counterparts. This Agreement may be executed in multiple counterparts, each of which will be deemed an original but all of which together will constitute one and the same instrument. Facsimile or electronic signatures shall be treated as original signatures.

K. Construction. This Agreement shall be construed as broadly as necessary to implement and comply with the HIPAA Rules. Any ambiguity in this Agreement shall be interpreted to permit compliance with the HIPAA Rules.

L. Entire Agreement. This Agreement shall constitute the sole and exclusive agreement between Covered Entity and Business Associate with respect to the matters set forth herein, and Covered Entity and Business Associate agree this Agreement amends, restates and supersedes any prior business associate agreement. Underlying Contract language or other agreement or understanding concerning the matters addressed herein.

IN WITNESS WHEREOF, Covered Entity and Business Associate have executed this Agreement as of the date first set forth above.

MOUNT CARMEL HEALTH CARE, LLC D/B/A
BURLINGTON MEDICAL AND REHAB
CENTER

By: _____

Title: _____
           ("Covered Entity")

KINDRED REHAB SERVICES, INC.
D/B/A REHABCARE

By: _____
        Jay Mattingly (Dec 2, 2016)

Title:  Chief Financial Officer
           ("Business Associate")